119 F.3d 175
 53 Soc.Sec.Rep.Ser. 793, Medicare & Medicaid Guide
P 45,499
STATE OF NEW YORK, Petitioner,
v.
Donna E. SHALALA, as Secretary of The Department of Health
and Human Services, United States Department of Health and
Human Services, Bruce C. Vladeck, as Administrator of Health
Care Financing Administration, Health Care Financing
Administration, Respondents.
 Nos. 208, 677, Dockets 92-4144(L), 96-4004(CON).
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 27, 1996.
Decided July 17, 1997.
 
 Charles A. Miller, Caroline M. Brown, Lewis Rosman, Covington & Burling, Washington, DC, John E. Robitzek, Acting General Counsel, New York State Department of Social Services, Albany, NY, Alan A. Pfeffer, Sarah van Leer, New York State Department of Social Services, Albany, NY, for Petitioner.
 Jeffrey A. Clair, Anthony J. Steinmeyer, U.S. Department of Justice, Washington, DC, Frank W. Hunger, Assistant Attorney General, U.S. Department of Justice, Washington, DC, for Respondents.
 Before: WALKER, McLAUGHLIN and JACOBS, Circuit Judges.
 WALKER, Circuit Judge:
 
 
 1
 This case presents two questions. First, whether the Secretary of the Department of Health and Human Services ("Secretary") erred in rejecting the attempt by petitioner State of New York ("New York") to resubmit an amendment to its state plan detailing the method of reimbursing providers of medical care in accordance with the federal Medicaid program. We hold that the Secretary erred in interpreting our decision in Pinnacle Nursing Home v. Axelrod, 928 F.2d 1306 (2d Cir.1991), as barring New York from taking further action to gain approval of the amendment found defective in Pinnacle.
 
 
 2
 The second question is whether the Secretary erred in determining that the submission of a "new" amendment by New York reflecting the same provisions as the amendment invalidated in Pinnacle required the publication of fresh public notice. We affirm the Secretary's interpretation of her own regulation as requiring publication of a new public notice for the submission of new amendments.
 
 BACKGROUND
 I. The Medicaid Program
 
 3
 The Medicaid program is a joint federal and state cost-sharing system that reimburses health care providers for the cost of treating individuals who are unable to pay for necessary medical care. Participation in the program by a state is voluntary. If a state chooses to participate in the program, it must comply with the Medicaid Act, 42 U.S.C. § 1396 et seq., and the regulations promulgated thereunder by the Secretary. See Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 502, 110 S.Ct. 2510, 2514-15, 110 L.Ed.2d 455 (1990).
 
 
 4
 A participating state, such as New York, must submit a "plan[ ] for medical assistance" to the Secretary for her approval in order to receive from the federal government partial reimbursement for health care expenditures. 42 U.S.C. §§ 1396 & 1396a(b). Payments by the federal government under the program are known as "federal financial participation" ("FFP"). 42 C.F.R. § 430.10. The plan for medical assistance is a "comprehensive written statement submitted by the [state] agency describing the nature and scope of its Medicaid program and giving assurance that it will be administered in conformity with [federal law]." Id.
 
 
 5
 The plan for medical assistance must, among other things, establish a method for reimbursing health care providers that render care to Medicaid beneficiaries. See 42 U.S.C. § 1396a(a)(13). Section 1396a(a)(13) of Title 42, known as the Boren Amendment, specifies the requirements with which a state's method of reimbursing health care providers must comply in order to receive FFP payments. Under this section, a state plan for medical assistance must:
 
 
 6
 provide ... for payment ... of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State ... ) which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities ... and to assure that individuals eligible for medical assistance have reasonable access ... to inpatient hospital services of adequate quality....
 
 
 7
 42 U.S.C. § 1396a(a)(13)(A).
 
 II. New York's Plan for Medical Assistance
 
 8
 This case arises from New York's attempt to amend its state plan for medical assistance to change the method of reimbursing medical providers for their wage costs. On January 1, 1986, New York adopted the Resource Utilization Group-II ("RUG-II") Medicaid reimbursement system for nursing facilities. Under RUG-II, reimbursement rates were set prospectively based on the degree of care required by patients. The facilities were classified in peer groups and the reimbursement rate was calculated based on the historical costs, adjusted for inflation, incurred by the peer group.
 
 
 9
 The RUG-II system adjusted for the variation in wage costs across New York by incorporating a Regional Input Price Adjustment Factor ("RIPAF"). The initial RIPAF methodology included in the RUG-II system based the reimbursement for wage costs on the average wage rate of the region of New York where the facility was located. See Pinnacle, 928 F.2d at 1310. Facilities with wage costs below the average wage rate received payments exceeding the actual cost they incurred for wages, whereas facilities with higher than average wage costs received payments below the actual cost they incurred for wages.
 
 
 10
 Publicly owned facilities complained that they were hurt by the RIPAF methodology because labor costs at public facilities were generally above the average rate as a result of various factors, including a unionized workforce and pension contributions mandated by state law. After public notice and comment, New York modified the RIPAF methodology, effective January 1, 1987, to accommodate the concerns of the higher wage facilities. See 10 N.Y.C.R.R. § 86-2.10; Regional Input Price Adjustment Factors, N.Y. St. Reg. 16 (Oct. 22, 1996). Under this modified RIPAF methodology, a range or "corridor" of wage costs was established for each region. If a facility in the region paid more or less than the average wage for the region, its reimbursement rate would be adjusted accordingly within the upper and lower limits of the corridor. For clarity, we refer to this modified RIPAF methodology adopted by New York in 1987 as the "corridor adjustment."
 
 
 11
 To amend New York's plan for medical assistance to reflect the corridor adjustment, New York, on March 31, 1987, submitted Medicaid State Plan Amendment ("SPA") 87-7 to the Health Care Financing Administration ("HCFA"), the federal agency charged by the Secretary with reviewing state plans for medical assistance, see 42 C.F.R. § 430.10. New York requested an effective date of January 1, 1987 for SPA 87-7. On February 21, 1989, HCFA approved SPA 87-7 with an effective date of January 1, 1987. Pinnacle, 928 F.2d at 1311.
 
 
 12
 In June 1989, a group of nursing homes adversely affected by the corridor adjustment filed suit in federal court against New York and the Secretary alleging that the corridor adjustment violated the procedural and substantive requirements of the Medicaid Act and the equal protection guarantees of the state and federal constitutions. Id. On August 15, 1989, the district court issued a preliminary injunction barring the application of the corridor adjustment, and partially granted the nursing homes' motion for summary judgment on the ground that the corridor adjustment was enacted without complying with federally-mandated procedures because the state's findings and assurances were inadequate. Id. On October 5, 1990, the district court entered final judgment on all claims. The court reaffirmed its order enjoining New York from implementing the corridor adjustment because of the inadequacy of the findings submitted to HCFA, dismissed the nursing homes' substantive challenges to the corridor adjustment, and declined to address the nursing homes' constitutional challenges. Id. at 1312.
 
 
 13
 The nursing homes appealed the district court's decision to dismiss their substantive challenges and leave their constitutional claims unresolved, and the state appealed the district court's decision to enjoin the corridor adjustment. On March 25, 1991, this court held in Pinnacle that the corridor adjustment "was enacted without complying with the procedural requirements of the [Medicaid Act]" based on the inadequate findings and assurances submitted to HCFA by New York. Id. at 1318. We vacated the district court's dismissal of the nursing homes' substantive and constitutional claims because if the state were to remedy the procedural defects in the enactment of the corridor adjustment, the nursing homes would be forced to initiate an entirely new action. Id. at 1317-18.
 
 
 14
 While the appeal was pending in Pinnacle, New York pursued administrative action through two separate avenues in an attempt to reimplement the corridor adjustment by curing the deficiencies found in Pinnacle.
 
 A. SPA 87-7
 
 15
 New York attempted to gain reapproval from HCFA for SPA 87-7, with an effective date of January 1, 1987, by submitting additional assurances and findings. New York argued that the Pinnacle decision permitted the state to seek federal approval of SPA 87-7 if the state cured the procedural defects identified in the Pinnacle litigation. On January 28, 1992, HCFA took the position that the Pinnacle decision did not permit the state to seek reapproval of SPA 87-7. On February 10, 1992, the Administrator of HCFA confirmed that HCFA believed that Pinnacle precluded the approval of SPA 87-7. On June 23, 1992, HCFA rejected New York's request for reconsideration of HCFA's position that the state could not submit supplemental assurances and findings to cure the defects in SPA 87-7. On August 20, 1992, New York filed a petition in this court for review of HCFA's rejection of New York's submissions with respect to SPA 87-7. The parties agreed to place the petition on the inactive docket pending the decision of HCFA on SPA 90-11.
 
 B. SPA 90-11
 
 16
 On March 30, 1990, the state submitted a "new" amendment, labeled SPA 90-11, reflecting the original corridor adjustment and supported by additional assurances. New York requested an effective date for the SPA of January 1, 1987 or January 1, 1990. On May 22, 1990, HCFA informed New York that its review of SPA 90-11 was complete and requested, among other things, the deletion of the January 1, 1987 proposed effective date "since 42 CFR 447.256(c) of the Federal regulations specifies that the effective date of an amendment may not be earlier than the first day of the quarter during which it is submitted." HCFA stated that a January 1, 1990 effective date "may be retained as it satisfies the Federal regulation."
 
 
 17
 On January 28, 1992, HCFA informed New York that the public notice provided for SPA 87-7 in 1986 could not satisfy the public notice required for SPA 90-11. HCFA concluded that implementation of the corridor adjustment through SPA 90-11 required a new public notice and rejected New York's reliance on a notice published in 1986. Thus, on May 26, 1993, HCFA approved the corridor adjustment contained in SPA 90-11, but rejected the effective dates proposed by New York. Instead, HCFA approved SPA 90-11 effective April 2, 1992, the day following the publication of a new public notice by New York. Upon reconsideration, the agency hearing officer recommended upholding the decision of HCFA. On November 28, 1995, the Administrator of HCFA, acting for the Secretary, affirmed the hearing officer's recommendation that HCFA disapprove the proposed 1987 and 1990 effective dates for SPA 90-11.
 
 
 18
 This appeal followed and was consolidated with New York's earlier appeal of the Secretary's refusal to reapprove SPA 87-7.
 
 DISCUSSION
 
 19
 Before addressing the merits of the appeals, we think it useful to note briefly the limited scope of this decision. This case concerns the extent of federal participation in New York's expenditures on Medicaid services; it does not concern obligations between New York and its health care providers. New York reached an overall settlement with those nursing homes challenging the corridor adjustment in prior litigation in state court, see Avon Nursing Home v. Axelrod, 195 A.D.2d 1046, 601 N.Y.S.2d 725 (4th Dep't 1993) (mem.), aff'd, 83 N.Y.2d 977, 616 N.Y.S.2d 327, 639 N.E.2d 1124 (1994), and in federal court, see Pinnacle, 928 F.2d at 1306. These nursing homes are not parties to this litigation and no issues concerning the ability of New York to recoup prior payments to nursing homes are presented in this case. Indeed, New York claims in its briefing to this court, and confirmed at oral argument, that the books are closed as to health care providers.
 
 I. Resubmission of SPA 87-7
 
 20
 The Secretary's refusal to reconsider SPA 87-7 is the subject of New York's first appeal. The Secretary interprets our decision in Pinnacle as barring New York from attempting to gain reapproval of 87-7 by submitting "supplemental findings and assurances for [87-7]." Her interpretation is based on language in Pinnacle declaring that 87-7 is "null and void." Pinnacle, 928 F.2d at 1316. The Secretary takes the position that New York may not retroactively cure the deficiencies found in 87-7, and may not rely on the public notice and 1987 effective date associated with 87-7.
 
 
 21
 Substantial deference is normally accorded to determinations made by the Secretary concerning the approval of SPAs. See State of New York v. Sullivan, 894 F.2d 20, 24 (2d Cir.1990); Pinnacle, 928 F.2d at 1312-13. However, unlike an administrative action that "require[s] significant expertise and entail[s] the exercise of judgment grounded in policy concerns," Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S.Ct. 2381, 2387, 129 L.Ed.2d 405 (1994) (quotations omitted), an agency has no special competence or role in interpreting a judicial decision. See H.W. Wilson Co. v. United States Postal Serv., 580 F.2d 33, 37 (2d Cir.1978); N.O.W. v. Social Sec. Admin., 736 F.2d 727, 735 n. 78 (D.C.Cir.1984) (concurring opinion). And certainly an agency is no better suited to interpret a judicial decision than the court that rendered it. Thus, the agency's interpretation of Pinnacle is not entitled to any special degree of deference.
 
 
 22
 We disagree with the Secretary and conclude that Pinnacle leaves little doubt that New York could cure the deficiencies of SPA 87-7. The Secretary's reliance on our declaration in Pinnacle that 87-7 is "null and void" is misplaced. Although Section IV(C) of Pinnacle states "we hold that [87-7] is null and void," Pinnacle, 928 F.2d at 1316, an examination of the entire opinion and its resolution of the substantive claims presented by the plaintiffs clearly leaves the door open for New York to revive 87-7.
 
 
 23
 The panel in Pinnacle stated its ultimate "null and void" holding in terms that were conditional:
 
 
 24
 We hold that [87-7] was enacted without complying with the procedural requirements of the Boren Amendment. Accordingly, it is declared null and void until such time that proper findings are submitted and approved by HCFA.
 
 
 25
 Id. at 1318 (emphasis added).
 
 
 26
 Moreover, the resolution of the substantive claims presented by the Pinnacle plaintiffs confirms that the opinion contemplated further action with respect to 87-7. The plaintiffs in Pinnacle argued that 87-7 was a substantive violation of the Boren Amendment because "the state failed to set reimbursement rates that are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." Id. at 1316. The district court dismissed their substantive challenge in deference to the right of a state to determine its own Medicaid plan. Id.
 
 
 27
 On appeal, we reinstated the substantive claims for further proceedings in the district court even though we affirmed the district court's determination that 87-7 was void on procedural grounds. The Pinnacle panel noted that "[a]lthough the court has declared [87-7] void on procedural grounds, that does not prevent the state from making the proper findings and resubmitting the plan to HCFA." Id. at 1317 (emphasis added). The panel was concerned that if New York did resubmit the plan, and the substantive claims were dismissed, "the nursing homes [would be] left with no case below ... and would be relegated to commencing a new action." Id. Thus, the panel expressly contemplated the possibility that the state might attempt to cure the deficiencies of 87-7. The panel reinstated the nursing homes' unresolved substantive claims to preserve the claims "if, and when, the state submits proper findings as required by the Boren Amendment." Id. at 1318.
 
 
 28
 The Secretary contends that allowing New York to revive 87-7 and seek a 1987 effective date permits a retroactive cure of the state's failure to support properly its original submission of 87-7. We agree with the Secretary that New York may not seek a 1987 effective date for 87-7. Medicaid regulations state that a SPA may take effect "no[ ] earlier than the first day of the calendar quarter in which an approvable amendment is submitted...." 42 C.F.R. § 447.256(c) (emphasis added). The amendment was not an "approvable" submission in 1987 because it was "unsupported by any findings whatsoever," and the assurances did "little more than duplicate the language of the applicable regulation." Pinnacle, 928 F.2d at 1315. We agree with the Secretary that SPA 87-7, as submitted in 1987 and initially approved in 1989, was not an "approvable" submission and thus, under the applicable regulations, New York may not receive an effective date prior to the submission of an "approvable" SPA.
 
 
 29
 This presents us with the question of the appropriate effective date for SPA 87-7. New York maintains that an effective date of January 1, 1990 is consistent with the applicable regulations and the decision in Pinnacle, and grounds its request for the 1990 date on its 1990 submission of additional assurances in support of SPA 87-7. The information submitted by New York in 1990 supported both the state's submission of SPA 87-7 and 90-11. As we discuss below, with respect to SPA 90-11, the Secretary determined that New York's submission was satisfactory, implying that SPA 87-7 would also be approvable in 1990, but delayed the effective date until a new notice was published by New York.
 
 
 30
 Whatever the notice defect applicable to SPA 90-11, it does not apply to SPA 87-7. The Secretary never challenged the adequacy of the 1986 notice in connection with the submission of 87-7 and in fact approved 87-7 in 1989. The state resubmitted the plan in response to Pinnacle, accompanied by additional material supporting the corridor adjustment. Nothing in Pinnacle invalidated the 1986 notice and the decision makes clear that the state had the option of continuing the approval process by submitting the appropriate assurances. Although we ultimately uphold the Secretary's interpretation of the notice regulation as applicable to the submission of SPA 90-11, the adequacy of the 1986 notice was never questioned. Thus, it is possible that SPA 87-7 could receive a 1990 effective date if the additional submissions, which were also submitted and ultimately approved by the Secretary with respect to 90-11, cured the serious defects subsequently found in Pinnacle.
 
 
 31
 Although it may be more efficient in this case for us to declare once and for all an appropriate effective date for SPA 87-7 in order to end this litigation between agencies who should be engaged in "cooperative federalism," Connecticut Dep't of Income Maintenance v. Heckler, 471 U.S. 524, 532 n. 22, 105 S.Ct. 2210, 2215 n. 22, 85 L.Ed.2d 577 (1985), we do not review SPAs in the first instance to determine when they become "approvable." That is an appropriate role for the agency charged by Congress with exercising policy discretion in the Medicaid area and should be done by the agency here with respect to SPA 87-7.
 
 
 32
 Thus, we vacate the Secretary's refusal to consider when SPA 87-7 became "approvable" and remand the case for further proceedings in order to determine the effective date of SPA 87-7.
 
 II. SPA 90-11
 
 33
 The issue in the second appeal is whether the Secretary erred in finding that New York could not rely on the public notice published in 1986 describing the corridor adjustment in order to comply with the notice requirement of 42 C.F.R. § 447.205.
 
 
 34
 HCFA regulations mandate that a state "must provide public notice of any significant proposed change in its methods and standards for setting payment rates for services." 42 C.F.R. § 447.205(a). New York argues that the notice published in 1986 in connection with SPA 87-7 informing the public of the proposed corridor adjustment satisfies the notice requirement of § 447.205 with respect to SPA 90-11. The Secretary rejects New York's interpretation, taking the position that although SPA 90-11 contains the same corridor adjustment included in SPA 87-7, "public notice of a nullified SPA No. 87-07 could not reasonably be accepted as public notice for SPA No. 90-11." The Secretary takes the position "that the reestablishment of the [corridor] adjustment methodology through [SPA] 90-11 requires the publication of a public notice to inform the public that the [corridor adjustment] will be reinstituted." See Letter from William Toby, Jr., Acting Administrator of HCFA, to Gregory Kaladjian, Commissioner of New York State Department of Social Services 2 (May 26, 1993), reprinted in J.A. at 258. According to the Secretary, § 447.205 requires that "a notice be published relating to each separate proposed [SPA] which involved a significant proposed change in [setting reimbursement rates]." Hearing Officer Decision at 6. The Secretary also notes that the public notice was published three and a half years before the submission of SPA 90-11 and argues that accepting the 1986 notice as adequate in this case would render the notice requirement "virtually meaningless."
 
 
 35
 Our review of the Secretary's interpretation of its own regulation is limited. We do not decide which competing interpretation is most reasonable or most consistent with the regulatory scheme. Instead, "the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." Thomas Jefferson Univ., 512 U.S. at 512, 114 S.Ct. at 2386 (internal quotations omitted). This highly deferential standard requires that we "defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." Id. (internal quotations omitted). Although New York's arguments are not without force, we are not persuaded that we should reject the Secretary's interpretation of the notice regulation.
 
 
 36
 New York challenges the Secretary's interpretation on several grounds. First, the state points to a May 22, 1990 letter from HCFA indicating that HCFA had completed its review of 90-11 and would permit a 1990 effective date. New York contends that its submission of 90-11 made clear its intent to rely on the 1986 notice and HCFA's failure to raise the notice problem in its initial response is evidence of inconsistent interpretations by the Secretary. However, HCFA's failure to raise the notice issue in its initial response to New York was reasonable in light of the ambiguous nature of New York's assurance that it complied with § 447.205. The submission states:
 
 
 37
 In making significant changes in its methods and standards for determining payment rates for 1990, the State of New York has complied with the public notice requirements set forth in 42 CFR 447.205. Notice of the proposed amendments was also given in compliance with the New York State Administrative Procedures Act. A notice explaining the amendment to § 86-2.10(m) of 10 NYCRR was published in the New York State Register on October 22, 1986.
 
 
 38
 As the Secretary points out, the reference to the 1986 notice can be reasonably interpreted as referring to a notice published in connection with the amendment of the state code, whereas a separate new notice was published to comply with the federal regulations. When the Secretary learned of New York's intention to rely on the 1986 notice in the course of reviewing SPA 90-11, and prior to any final approval, the Secretary informed New York of the notice problem. In sum, the record does not indicate that the Secretary knowingly acquiesced in the state's reliance on the 1986 notice by sending an initially favorable letter to New York.
 
 
 39
 Second, New York argues that the Secretary's interpretation unlawfully imposed a retroactive procedural requirement on the state. We disagree. This is not a case where New York structured its program in reliance on prior actions of the Secretary and New York's reliance is now undermined by an interpretation with retroactive effect. To be sure, the Secretary's determination does have retroactive effect in the sense of preventing New York from gaining a pre1992 effective date for 90-11. However, in adjudication, "retroactivity is not only permissible but standard." Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 221, 109 S.Ct. 468, 478, 102 L.Ed.2d 493 (1988) (Scalia, J., concurring). New York concedes that this case presents a unique situation and puts forth no evidence that it relied on any prior pronouncements of the Secretary in comparable situations. Although certain agency actions may result in impermissible retroactivity, see John F. Manning, Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules, 96 Colum. L.Rev. 612, 670-72 & nn. 281-84 (1996), such as where a novel regulatory interpretation is used to "cut off a party's right" without fair notice, Satellite Broad. Co. v. FCC, 824 F.2d 1, 4 (D.C.Cir.1987), or where the determination is an abrupt departure from well established practice, see NLRB v. Oakes Mach. Corp., 897 F.2d 84, 90 (2d Cir.1990), New York fails to demonstrate that the Secretary's resolution of the novel issue in this case results in a "manifest injustice" because New York relied on settled practice or took action based on prior agency interpretations. Id.
 
 
 40
 Third, New York argues that the public notice requirement of § 447.205(a) does not apply to SPA 90-11 because the regulation only applies when an amendment contains a "significant proposed change" in payment methods. According to New York, the actual state regulations setting forth the corridor adjustment were adopted in 1987, and these regulations stand "as a continuing public notice of the intended method of determining reimbursement rates." Brief for Petitioner State of New York at 48.
 
 
 41
 New York's argument fails for two key reasons. First, New York's argument is undermined by its own statement in SPA 90-11 that it was "making significant changes in its methods and standards for determining payment rates for 1990." Second, New York's reliance on the adoption of the corridor adjustment regulations in 1987 is misplaced. While it is true that the regulations were adopted, litigation in federal and state court barred the state from applying the methodology reflected in the regulations and recouping payments made to health care providers. See Valley View Manor Nursing Home v. Axelrod, No. Civ-89-0744T, slip op. at 8 (W.D.N.Y. August 29, 1991); Avon Nursing Home, 601 N.Y.S.2d at 727. Thus, the Secretary's determination that New York's attempt to implement the corridor adjustment through a new SPA was a "significant" change was not arbitrary and capricious.
 
 
 42
 In sum, the Secretary's determination that a new notice is required in order to receive an effective date for the submission of SPA 90-11, which is formally a new SPA (albeit reflecting a methodology previously published) unlike the resubmission of SPA 87-7, is entitled to deference in the novel facts presented in this case.
 
 CONCLUSION
 
 43
 We vacate the Secretary's refusal to consider SPA 87-7 and remand for further administrative proceedings consistent with this opinion. We affirm the Secretary's rejection of a 1990 effective date for SPA 90-11.