CONCOURSE REHABILITATION & NURSING CENTER INC.; Concourse Nursing Home, Plaintiff–Appellant,

v.

Barbara A. DeBUONO, individually and as Commissioner of the New York State Department of Health, Defendant–Appellee.

No. 98–7894.

United States Court of Appeals, Second Circuit.

Argued Nov. 9, 1998.

Decided June 3, 1999.

Marvin Neiman, New York, New York (Theodore T. Mairanz, Betsy R. Malik, Neiman Ginsburg & Mairanz, P.C., New York, New York, of counsel), for Appellant.

Barbara K. Hathaway, Assistant Attorney General, New York, New York (Dennis C. Vacco, Attorney General of the State of New York, John W. McConnell, Deputy Solicitor General, Michael S. Belohlavek, Assistant Attorney General, New York, New York, of counsel), for Appellee.

Cornelius D. Murray, Albany, New York (Pamela A. Nichols, O'Connell and Aronowitz, P.C., Albany, New York, of counsel), filed a brief for Amicus Curiae New York State Health Facilities Association, Inc.

Evelyn Huang, New York, New York, filed a brief Amicus Curiae for The Greater New York Health Care Facilities Association.

Harvey Weinberg, Garden City, New York (John F. Kaley, Weinberg, Kaley, Gross & Pergament, L.L.P., of counsel), filed a brief Amicus Curiae for The Southern New York Association, Inc.

Before: WINTER, Chief Judge, CARDAMONE, and STRAUB, Circuit Judges

CARDAMONE, Circuit Judge:

Plaintiff, Concourse Rehabilitation & Nursing Center, Inc. and Concourse Nursing Home (collectively Concourse, plaintiff or appellant), is a 240-bed residential health care facility in the Bronx, New York. Concourse was found as a result of a State audit to have been reimbursed for care of Medicaid patients in an amount greater than that to which it was entitled. It thereafter brought a 42 U.S.C. § 1983 suit in the United States District Court for the Southern District of New York, challenging the audit on the grounds that the State changed its Medicaid plan without federal approval, and has appealed from that court's adverse judgment.

A State administers its Medicaid plan pursuant to the provisions of Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, 1396a-u (1994 & Supp. II 1996) (Medicaid Act or Act). After initial approval of a State plan, the State is not required to seek further federal approval unless it makes an actual change in its plan's terms and conditions. Unlike those things viewed as changeless—the constancy of the North Star, the color of one's skin, and the spots of a leopard—the State Medicaid plan can be changed. The subject of this appeal is whether on the record in this case such a change was effectuated to a degree sufficient to require the State to seek federal approval.

■ Our precedents dictate that federal jurisdiction over a § 1983 claim is lacking when such claim alleges simply that a State has violated the provisions of its own Medicaid plan, in the absence of any conflict with federal law. What our precedents have not resolved—and what we must answer—is whether a federal court may entertain a § 1983 claim alleging that a State's interpretation of its own plan departs so far from that plan's terms as to constitute a *de facto* amendment to it, thereby triggering federal approval requirements under the Act.

## BACKGROUND

### A. *The Medicaid Program*

We deal on this appeal with the Medicaid Program, a program that pays the

costs of medical services for indigent persons who cannot afford such care and that is jointly funded by the federal and State governments. While participation by a State is optional, if a State chooses to join the Medicaid Program, it must submit a plan to the U.S. Secretary of Health and Human Services (Secretary) for approval. The plan must be in writing and must comprehensively describe the nature and scope of the State's Medicaid program. Upon approval of the plan by the Secretary, the State becomes entitled to receive reimbursement from the federal government for a percentage of the monies it pays to residential health care facilities for their care of Medicaid patients. The balance of the costs for such care is furnished by State and local governments.

The joint program is administered by the federal and State governments pursuant to the Medicaid Act found in Title XIX of the Social Security Act. The federal money distributed to individual States for the operation of State-formulated medical assistance plans must be approved by the Health Care Financing Administration (Health Financing Agency), a division of the Department of Health and Human Services, according to standards contained in 42 U.S.C. § 1396a(a). *See New York v. Shalala,* 119 F.3d 175, 177 (2d Cir.1997). At the time this case arose, the approval process was governed by a subsection of § 1396a(a) known as the "Boren Amendment." *See* 42 U.S.C. § 1396a(a)(13) (1994) (former Boren Amendment); *Pinnacle Nursing Home v. Axelrod,* 928 F.2d 1306, 1309 (2d Cir.1991) (discussing the Boren Amendment); Balanced Budget Act of 1997, Pub.L. No. 105–33, § 4711(a)(1), 111 Stat. 251, 507–08 (rewriting the Boren Amendment as applicable to payment for items and services furnished on or after Oct. 1, 1997).

Pursuant to the Boren Amendment, the Secretary issued regulations requiring further federal approval of certain amendments to State plans. These regulations, currently in effect, require that the State

plan provide for amendments to the plan itself:

> (c) *Plan amendments.* (1) The [State Medicaid] plan must provide that it will be amended whenever necessary to reflect—
>
> . . .
>
> (ii) Material changes in State law, organization, or policy, or in the State's operation of the Medicaid program.

42 C.F.R. § 430.12(c) (1998). With respect to inpatient hospitals and long-term care facilities in particular, the regulations further provide:

> (a) *State assurances.* In order to receive [Health Financing Agency] approval of a State plan change in payment methods and standards, the [State] Medicaid agency must make assurances satisfactory to [the Health Financing Agency] that the requirements set forth in paragraphs (b) through (i) of this section are being met. . . .
>
> (b) *Findings.* Whenever the Medicaid agency makes a change in its methods and standards, but not less often than annually, the agency must make the following findings:
>
> (1) *Payment rates.* (i) The Medicaid agency pays for inpatient hospital services and long-term care facility services *through the use of rates that are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers* to provide services in conformity with applicable State and Federal laws, regulations, and quality and safety standards.

*Id.* § 447.253(a)-(b)(1)(i) (emphasis added).

B. *The New York State Medicaid Plan*

Under Article 28 of the New York Public Health Law, the Commissioner of the New York State Department of Health is responsible for setting State Medicaid reimbursement rates for nursing homes, more formally known as "residential health

care facilities." *See* N.Y. Pub. Health Law § 2808 (McKinney 1993 & Supp.1999). The current method for setting such rates—initially implemented by the New York State Department of Health (Department) on January 1, 1986—is set forth in Subpart 86–2 of the Commissioner's Administrative Rules and Regulations. *See* N.Y. Comp.Codes R. & Regs. tit. 10, § 86–2 (1995).

Under the present approach, the direct cost component of Medicaid reimbursements for a particular nursing home is gauged according to a "case mix index," which reflects the number of patients in the facility, the severity of each patient's diagnosis, and the consumption of resources required by patients with similar diagnoses. *See id.* § 86–2.10(a)(5). Hence, a patient with a severe condition, but one that is likely to improve under treatment, will entitle the nursing home to greater Medicaid reimbursement from State and local monies than will a patient whose equally severe condition is not likely to improve with treatment.

To ensure that the case mix index is kept up-to-date, the Department requires health care facilities to evaluate their patients periodically using a form known as the "Patient Review Instrument" (Patient Review). *See id.* § 86–2.30(a), (i). As additional safeguards for accuracy, only qualified nurses may prepare Patient Review, and the Department contracts with the Foundation for Quality Medical Care (Foundation) to audit the Patient Review process. *See id.* § 86–2.30(c)(2), (e)(5).

Patient Review employs a number of standards, formally called "documentation qualifiers." These standards draw inferences regarding a patient's medical condition based upon documentation contained in the patient's medical record and are then used to calculate the case mix index. The instant controversy, for example, centers on a dispute as to the Patient Review qualifiers relevant to classifying a patient as needing either "maintenance therapy" or "restorative therapy," depending on the level of physical and/or occupational therapy that the patient receives.

As a prerequisite to classifying a patient at "maintenance therapy," the qualifiers state that the patient's medical record must indicate the patient receives therapy meeting the following description:

> Therapy is provided to maintain and/or retard deterioration of current functional/ADL ["Activities of Daily Living"] status. Therapy plan of care and progress notes should support that patient has no potential for further or any significant improvement.

*Id.* § 86–2.30(i) (Patient Review, Question 27). The qualifiers dictate the following evaluative standard for classifying patients at "restorative therapy":

> There is positive potential for improved functional status within a short and predictable period of time. Therapy plan of care and progress notes should support that patient has this potential/is improving.

*Id.*

In addition to these Patient Review qualifiers, the Department has promulgated an "Audit Tool"—not originally included in the State plan approved by the Health Financing Agency—as a guide to help the Foundation audit the Patient Review process. The Audit Tool provides the following standard by which the Foundation's assessors are to evaluate whether a nursing home has properly classified a patient at restorative therapy as opposed to at maintenance therapy:

> Patient's condition is realistically expected to *improve* significantly within a reasonable (and generally predictable) period of time.

## C. *Prior Proceedings*

In 1991 and 1993 Concourse was audited by the New York State Department of Health. It passed these audits. In March 1996 the Department notified Concourse that another audit had been scheduled with reference to Patient Reviews Con-

course had prepared and submitted in May 1995. Over the next several months, the audit was conducted in three stages, with each stage giving increased scrutiny to the patient evaluations made by Concourse.

Following the final stage of the audit, conducted in June 1997, the Department concluded that Concourse had erroneously classified a number of patients at restorative therapy instead of at maintenance therapy. Upon reclassifying these patients, the Department found that, as a result of the misclassifications, Concourse had been overpaid $514,000 in Medicaid reimbursements. It proposed to recoup this overpayment by withholding future Medicaid reimbursement payments due Concourse.

On April 21, 1997 plaintiff filed suit in federal district court against Barbara A. DeBuono, both individually and as Commissioner of the Department, for alleged violations of 42 U.S.C. §§ 1983 and 1396. Specifically, the complaint sought injunctive relief against the recoupment of Medicaid funds on the grounds that the Department had failed to adhere to the State's Medicaid plan in conducting its audit of the May 1995 Patient Reviews and, in addition, that the Department's interpretation of the relevant document qualifiers constituted a *de facto* amendment to the State plan, thereby requiring federal approval prior to implementation.

On February 2, 1998 District Judge Kimba M. Wood issued a Temporary Restraining Order against recoupment of the alleged overpayment of Medicaid funds. The case was then transferred to District Judge Samuel Conti, who held a bench trial and on June 11, 1998 issued an opinion. *See Concourse Rehabilitation & Nursing Ctr. Inc. v. DeBuono,* No. 97 Civ. 2851 (S.D.N.Y. June 11, 1998) (*Concourse* ). Judgment on the merits was entered against Concourse the next day. On June 30, 1998 Judge Wood issued a stay of judgment pending appeal, conditioned upon Concourse's pursuit of an expedited appeal. This appeal followed.

## DISCUSSION

### I Standard of Review

The threshold issue in this, and every case, is whether a federal court has subject matter jurisdiction over the suit before it. We are obliged to review that issue *de novo,* regardless of whether the parties invite us to do so. *See Air Espana v. Brien,* 165 F.3d 148, 151 (2d Cir.1999). Beyond ·that, on appeal from this bench trial, we examine the trial court's conclusion of law *de novo* and its factual findings under the clearly erroneous standard.

### II Jurisdiction

#### A. *State Plan Violations*

Concourse reasserts on appeal its argument that the manner in which the Department conducted its audits of the May 1995 Patient Reviews violated the State Medicaid plan. Appellant complains that in reclassifying patients to "maintenance therapy," the auditors failed both to give the requisite deference to the diagnoses made by Concourse's licensed therapists and to limit review of the patients' medical documentation to the 28–day "snap shot" period on which Patient Reviews originally were based. It contends, in addition, that the auditors violated State procedural requirements when they allegedly prevented Concourse from presenting proof at the exit conferences, which followed the audits, that its patients met the "restorative therapy" standard.

As we repeatedly have explained, the failure of a State authority to comply with State regulations cannot alone give rise to a § 1983 cause of action. *See Concourse Rehabilitation & Nursing Ctr. Inc. v. Wing,* 150 F.3d 185, 187–89 (2d Cir.1998) (*Wing*); *Kostok v. Thomas,* 105 F.3d 65, 68 (2d Cir.1997). To state a federal cause of action, a plaintiff must allege a "specific conflict between a state plan or practice on the one hand and a federal mandate on the other." *Oberlander v. Perales,* 740 F.2d

116, 119 (2d Cir.1984). The fact that federal law conditions State participation in the Medicaid program on the State's adoption of a Medicaid plan does not thereby transform provisions of a State's plan into federal law. The reason is plain. Were it otherwise, federal jurisdiction could be invoked to review each claimed error in a State's administration of its Medicaid plan, which would needlessly undermine State sovereignty, contrary to settled precedent. *See id.* at 119.

■ In this light, we look in vain to find any specific federal provision that appellant cites as conflicting with the State audit practices described above. To the extent we understand Concourse to be alleging a conflict with constitutional Due Process, plaintiff has adduced nothing to suggest that the review provided under Article 78 of New York's Civil Practice Law & Rules is an inadequate postdeprivation remedy. Whether negligent or intentional, the deprivation of property through the random and unauthorized acts of a State or federal employee does not constitute a violation of the procedural requirements of due process "if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).

■ To the extent that appellant alleges a conflict with federal Medicaid regulations requiring that State plans provide for prompt administrative review, *see, e.g.,* 42 C.F.R. § 447.253(e) (1997), the New York State Medicaid plan provides for on-site exit conferences following audits, *see* N.Y. Comp.Codes R. & Regs. tit. 10, § 86–2.30(e)(5). Because the New York plan was reviewed and approved by the Health Financing Agency, Concourse must show that such plan provisions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" before we will find them substantively invalid. *Pinnacle Nursing Home,* 928 F.2d at 1313 (quoting Administrative Procedure Act, 5

U.S.C. § 706(2)(A)). This Concourse has failed to do.

■ In the end, appellant's argument reduces to the contention that the Department has failed to comply with the New York State Medicaid plan and that this failure somehow violates either constitutional Due Process or the federal Medicaid regulations. But, as explained above, absent the assertion of a specific conflict between the State plan or practices and federal law, such allegations fail to give rise to a federal cause of action. Because Concourse's allegations fail to assert such a specific conflict, and because the Eleventh Amendment bars our consideration of purely State law claims, *see Wing,* 150 F.3d at 189, we lack jurisdiction to decide appellant's claim.

### B. *De Facto Amendment*

Concourse further declares that the Department's interpretation of the New York State Medicaid plan departs so far from the terms of the plan as to constitute a *de facto* amendment to the plan, requiring federal approval prior to implementation. Specifically, appellant asserts that the Audit Tool, both on its face and as applied, parts from the terms of the qualifier for restorative therapy to such a pronounced degree as to effect a *de facto* amendment to the State plan. First, it points to the Audit Tool's requirement that a patient be expected to improve "significantly" and notes that the restorative therapy qualifier speaks only of potential for improvement, without the strong adverb "significantly," which connotes an important or weighty improvement. In addition, Concourse points to the Department's interpretation of the qualifier to require evidence of *actual* improvement in a patient's medical condition subsequent to diagnosis, and urges that this view contradicts the qualifier's requirement that there merely be "positive *potential* for improved functional status" (emphasis added). For these reasons, appellant maintains that the Department has changed the restorative therapy qualifier

by *de facto* amendment, and in that way has brought into play the amendment approval provisions of 42 C.F.R. §§ 430.12(c) and 447.253(b).

### 1. *Requirement of Change*

As a preliminary matter, common sense, precedent, and the text of the regulations dictate that there must be some "change" in a State's Medicaid plan before the amendment provisions of §§ 430.12(c) and 447.253(b) will be activated. *See United Cerebral Palsy Ass'ns v. Cuomo,* 966 F.2d 743, 746 (2d Cir.1992) (finding these provisions inapplicable where there had been no change). In the present case, Concourse does not argue that the Department has changed the terms of the State Medicaid plan itself. Hence, its point that the Department has "changed" the State Medicaid plan must be understood to encompass two inquiries: first, as a question of fact, whether the State has changed its interpretation or application of the plan; and, second, as a question of law, whether a particular interpretation or application of the plan constitutes a change in the terms of the plan itself.

Addressing the first question, the district court found the Department has not "changed" the Audit Tool since its adoption ten years ago. *See Concourse,* slip op. at 10–11. Further, the court also made a finding that it was a change in Concourse's practices in 1994—a new emphasis on providing patients with restorative therapy— that made the critical difference between the favorable audits in 1991 and 1993 and the unfavorable audit of the 1995 Patient Reviews. *See id.* Concourse has presented nothing suggesting that these findings were clearly erroneous; accordingly, we leave them untouched.

■ Addressing the second question, the district court ruled that the Audit Tool's use of the term "significantly" did not constitute a "change" in the qualifier for restorative therapy. *See id.,* slip op. at 8–10. It reasoned that inasmuch as the qualifier for *maintenance* therapy requires

the *absence* of a "potential for further or any significant improvement," it is consistent that the qualifier for *restorative* therapy, by way of contrast, should insist on the *presence* of a potential for "significant improvement." Any other interpretation might eliminate the distinction between the two categories and render much of the qualifier language superfluous. Applying a *de novo* standard of review to this conclusion of law, we think the trial court's reasoning sound.

The remaining issue—one apparently not addressed by the district court—is whether the Department's requirement of actual improvement constitutes a "change" in the qualifier for restorative therapy. At first blush, the restorative therapy qualifier appears to embody a prospective viewpoint, in the sense that classification of a restorative therapy patient requires "potential" for improvement at some point in the future. Read in this manner, the qualifier is arguably inconsistent with the Department's adoption of a retrospective view requiring that, on audit, the patient show *actual* improvement after treatment to justify reimbursement for restorative therapy. The Department believes the two standards reconcilable. It points out that the phrase "patient has potential/is improving" is read to mean that newly admitted patients must show "potential" for improvement while patients admitted to the health care facility for some time should show signs that they are actually "improving."

### 2. *Change: Interpretation versus Amendment*

■ On a more fundamental level, determining whether the Department's interpretation constitutes a "change" to the State Medicaid plan implicates the analytical difficulty of distinguishing between an interpretation and an amendment generally. To some degree, every construction of a State Medicaid plan necessarily effects a "change" to the plan, since a construction that added nothing to the plan's

terms would be redundant. On the other hand, insisting that an interpretive change be "significant" as a predicate to triggering the plan amendment regulations would be wholly inconsistent with the history of those provisions. *See* Medicaid Program, Revisions to Medicaid Payments for Hospital and Long–Term Care Facility Services, 52 Fed.Reg. 28,141, 28,142–43, 28,147 (July 28, 1987) (eliminating the requirement that changes be "significant" under 42 C.F.R. § 447.253(b)).

One approach to resolving this difficulty might be to analogize to federal administrative rulemaking and its longstanding distinction between "interpretive rules" (which are exempt from notice and comment requirements) and "legislative rules" (which are not) under the Administrative Procedure Act, 5 U.S.C. § 553 (1994). *See, e.g., White v. Shalala*, 7 F.3d 296, 303 (2d Cir.1993) ("The central question is essentially whether an agency is exercising its rule-making power to clarify an existing statute or regulation, or to create new law, rights, or duties in what amounts to a legislative act."). But even this distinction, which has enjoyed several decades of judicial elucidation, "has been described by courts and commentators as 'fuzzy,' 'tenuous,' 'blurred,' 'baffling,' and 'enshrouded in considerable smog.'" Elizabeth Williams, Annotation, *What Constitutes "Interpretative Rule" of Agency so as to Exempt Such Action from Notice Requirements of Administrative Procedure Act (5 USCS § 553(b)(3)(A))*, 126 A.L.R. Fed. 347, 375 (1995) (collecting cases). Given the inherent vagueness of this distinction, and given the additional problems that would arise were we to transplant this distinction to State law, we decline to infer—absent a clear expression to the contrary—that Congress meant to place the federal courts in such a tangle, and to ask us—as Alexander the Great was asked—to untie such a Gordian knot.

■ Indeed, 42 C.F.R. § 430.12(c) simply requires that a "plan *must provide* that it will be amended whenever necessary to reflect" certain "[m]aterial changes" (emphasis added). By its terms, this regulation is satisfied once a State plan includes the appropriate provision, and the failure of a State to adhere to that provision cannot give rise to a federal claim, for the reasons discussed earlier. Further, although § 447.253(b) appears to apply to any "change in [the State's] methods and standards" of payment, subsection (a) clarifies that subsection (b) applies only to a "State plan change," suggesting in that way that the federal approval requirements are brought into play not simply by a change in the State's administration of the plan, but only by an alteration of the plan itself, *i.e.*, its actual written terms. *Compare Oregon Ass'n of Homes for the Aging, Inc. v. Oregon*, 5 F.3d 1239, 1243–44 (9th Cir.1993) (holding that § 447.253(b) applied where a change to the State plan would have reclassified services under the plan), *with United Cerebral Palsy Ass'ns*, 966 F.2d at 746 (holding that a delay in the State's payment of Medicaid reimbursements was not a change in methods and standards of payment to which § 447.253(b) applied), *and Illinois Council on Long Term Care v. Bradley*, 957 F.2d 305, 309 (7th Cir.1992) (same).

### 3. *Interpretation Generally Does Not Constitute Change*

■ Accordingly, we hold that a State's interpretation of its own Medicaid plan cannot constitute a "change" as that term is used in §§ 430.12(c) and 447.253(b) unless, at a minimum, the clear and unequivocal effect of the interpretation is actually to alter the written terms of the plan. Absent such an alteration, any *de facto* amendment claim reduces simply to an assertion that the State has misapplied its own plan, and as explained earlier, such claim fails to state a federal cause of action.

■ Turning to the case at hand, we can hardly say that the Department's interpretation clearly and unequivocally alters the terms of the restorative therapy

qualifier. Concourse does not dispute that the terms of that qualifier remain intact, and on its face the interpretation does not purport to rewrite, to supersede, or to delete those terms. Although the Department's interpretation is perhaps not the most obvious reading, we cannot say that it constitutes a *de facto* amendment to the terms of the qualifier.

Because there has been no "change" in the State Medicaid plan such as to precipitate the federal Medicaid amendment provisions, Concourse has failed to demonstrate the sort of "specific conflict" with federal law necessary to support a federal cause of action. And, because the Eleventh Amendment bars our consideration of the purely State law claim that a State has misapplied its own regulations, we lack jurisdiction to decide this claim as well.

■ Nothing in our decision today, however, should be construed to preclude a health care provider from challenging a State's interpretation of its Medicaid plan insofar as the substance of that interpretation raises doubts whether the State's rates of reimbursement are "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities" under the Boren Amendment. 42 U.S.C. § 1396a(a)(13)(A) (1994) (rewritten applicable to services on or after Oct. 1, 1997); *see also Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 509–10, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) (holding that the Boren Amendment created a substantive right enforceable by health care providers under 42 U.S.C. § 1983); *United Cerebral Palsy Ass'ns,* 966 F.2d at 745–46 (reviewing a State plan under the Boren Amendment as the plan was applied, *i.e.,* not merely on its face); *Illinois Council on Long Term Care,* 957 F.2d at 307–09 (same).

In other words, to the extent that we hold that a federal court is bound to accept that a State Medicaid plan means what the State says it means, this holding should not be taken *ipso facto* to imply that the plan, so interpreted, somehow becomes exempt from the Boren Amendment's substantive requirements. That question was neither addressed by the district court nor raised before us; hence, we do not purport to foreclose that avenue of relief.

■ Finally, one of the *amici curiae* to the appeal raises a novel argument suggesting that the Department's interpretation of the restorative therapy qualifier may be preempted by federal law insofar as its practical effect is to prevent health care providers from complying with 42 U.S.C. § 1396r and 42 C.F.R. § 483. This argument was neither addressed by the district court nor briefed in any detail by the parties. Although Concourse does raise the argument in a footnote to its reply brief, " '[w]e do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review.' " *United States v. Barnes,* 158 F.3d 662, 673 (2d Cir.1998) (alteration in original) (quoting *United States v. Restrepo,* 986 F.2d 1462, 1463 (2d Cir.1993)). For that reason, we also decline to address this argument.

## CONCLUSION

Accordingly, the judgment of the district court is vacated and remanded with instructions to it to dismiss plaintiff's complaint for lack of federal jurisdiction. In so ruling, we do not intend to foreclose plaintiff, if so advised, from further pursuing the Boren Amendment and preemption questions alluded to earlier.

Appeal dismissed.