**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-3220
_____

NEW JERSEY PRIMARY CARE ASSOCIATION INC.

v.

STATE OF NEW JERSEY DEPARTMENT OF HUMAN
SERVICES; JENNIFER VELEZ, ESQ., in her Official
Capacity as Commissioner of the State of
New Jersey Department of Human Services;
STATE OF NEW JERSEY DEPARTMENT OF HUMAN
SERVICES, DIVISION OF MEDICAL ASSISTANCE AND
HEALTH SERVICES; VALERIE HARR, in her Official
Capacity as Director of the Division of Medical Assistance
and Health Services,
                                        Appellants
_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF NEW JERSEY
(D.C. Civil No. 12-cv-00413)
District Judge:  Honorable Joel A. Pisano
_____

Argued:  March 20, 2013
_____

Before: FUENTES, CHAGARES and BARRY,
*Circuit Judges*

(Opinion Filed:  July 9, 2013)
_____

Caroline M. Brown, Esq. (*Argued*)
Ze-wen J. Chen, Esq.
Covington & Burling, LLP
1201 Pennsylvania Avenue, N.W.
Washington, DC 20004

*Counsel for Appellants*

Khatereh S. Ghiladi, Esq. (*Argued*)
Rupinderjit S. Grewal, Esq.
Feldesman Tucker Leifer Fidell, LLP
1129 20th Street, N.W.
4th Floor
Washington, DC 20036

*Counsel for Appellee*

_____

OPINION OF THE COURT
_____

BARRY, *Circuit Judge*

Under the federal Medicaid statute, 42 U.S.C. § 1396 *et seq*., states participating in Medicaid and implementing a managed care environment are obligated to make, at least every fourth month, supplemental payments (known as "wraparound payments") to federally-qualified health centers ("FQHCs") in an amount equal to the difference between a predetermined rate set by the Medicaid statute multiplied by the number of Medicaid patient encounters, and the amount paid to FQHCs by managed care organizations ("MCOs")[1] for all Medicaid-covered patient encounters. In 2011, concerned that gaps in the FQHCs' claim verification process led to significant overpayments, the New Jersey Department of Human Services (the "State") changed its methodology for calculating wraparound payments. Under the new methodology, instead of basing the payments solely on the

_____

[1] MCOs are commonly referred to as health maintenance organizations or "HMOs".

number of Medicaid encounters and their total MCO receipts as self-reported by FQHCs, the State would instead rely on data reported by MCOs absent receipt of certain additional data from the FQHCs.  Because MCOs only report encounters that they have approved and paid, prior MCO payment would become a prerequisite to State wraparound reimbursement under the new system.

Plaintiff, the New Jersey Primary Care Association ("NJPCA"), a nonprofit organization under § 501(c)(3) of the Internal Revenue Code and comprised of New Jersey FQHCs, brought the instant action claiming that this change violated the FQHCs' right to due process and federal and state law governing Medicaid wraparound payments, resulting in considerable budget shortfalls.  The State moved for summary judgment; NJPCA cross-moved for summary judgment and moved for a preliminary injunction demanding the immediate payment of the amount the State would have paid under the preexisting system and enjoining the State from implementing the change.  The District Court granted NJPCA's motions for summary judgment and a preliminary injunction, and denied the State's motion.  The State now appeals.  We will affirm in part, and reverse in part.

## I. BACKGROUND

### A. Statutory Framework

Title XIX of the Social Security Act authorizes federal grants to states for medical assistance to qualified low-income persons.  *Harris v. McRae*, 448 U.S. 297, 301 (1980).  The Medicaid program is jointly financed by federal and state governments but is administered entirely by the states.  States that elect to participate in the program must comply with the federal Medicaid statute and implementing regulations promulgated by the Secretary of Health and Human Services ("HHS").  *Pa. Pharmacists Ass'n v. Houstoun*, 283 F.3d 531, 533 (3d Cir. 2002) (en banc). Among the federal requirements is the requirement that the state adopt an implementation "plan" approved by the federal government, consisting of a "comprehensive written statement submitted by the [state]

3

agency describing the nature and scope of its Medicaid program." 42 C.F.R. § 430.10; *see also* 42 U.S.C. § 1396. The federal government will review the proposal and "determine whether the plan can be approved to serve as a basis for Federal financial participation . . . in the State program." 42 C.F.R. § 430.10. State plans must be amended whenever necessary to reflect changes in the federal law or "[m]aterial changes in State law, organization, or policy, or in the State's operation of the Medicaid program." *Id.* § 430.12(c)(ii).

States participating in Medicaid must also offer non-profit federally-qualified health centers—the FQHCs—known as community health centers, which receive federal grants under Section 330 of the Public Health Service Act ("PHSA") and provide primary and preventive care to medically underserved communities. 42 U.S.C. § 254b. Where available, such as for Medicaid-eligible encounters, FQHCs must seek reimbursement for their expenses. *Id.* § 254b(k)(3)(F). The federal Medicaid statute specifically regulates FQHC reimbursement for services provided to Medicaid beneficiaries. *Id.* § 1396a(bb)(1). Under the Medicaid program, reimbursement payments owed by each participating state to FQHCs are assessed through what is known as the Prospective Payment System ("PPS"). *Id.* § 1396a(bb)(1)-(3). Stated simply, the FQHCs' reimbursement from the state is calculated by multiplying the number of Medicaid encounters by the average reasonable costs of serving Medicaid patients in 1999 and 2000 (the "PPS rate"), adjusted yearly for inflation by a factor known as the Medicare Economic Index. *Id.* The system creates risks of both under- and over-payment relative to actual costs. If FQHCs control their costs below the PPS reimbursement, they stand to earn a profit. If costs exceed the PPS reimbursement, FQHCs suffer a loss.[2]

---

[2] Until 2000, in order to ensure that federal grant awards under the PHSA did not subsidize benefits that should be paid by Medicaid, the federal Medicaid statute required that state Medicaid programs reimburse FQHCs for *all reasonable costs* incurred when providing services to Medicaid

4

Like many other states, New Jersey has adopted a managed care program, pursuant to which it contracts with managed care organizations—the MCOs—that arrange for the delivery of health care services to individuals who enroll with them. Because MCOs do not typically operate their own facilities, MCOs subcontract with providers, including FQHCs, to provide medical services. In New Jersey, MCOs receive prospective payments from the State based on a fixed monthly fee per patient and the anticipated use of services (the "capitation payment"). The MCOs, in turn, contract with FQHCs to provide medical services, and reimburse FQHCs for Medicaid-covered encounters out of their capitation funds. Though the costs are agreed upon, under the Medicaid statute, MCOs must make to FQHCs at least "the level and amount of payment which the [MCO] would make for the services if the services were furnished by a provider which is not a [FQHC]." *Id.* § 1396b(m)(2)(A)(ix).

A frequent problem, and the subject of the dispute before us, occurs in a managed care system: the contracted-for payment from the MCO to the FQHC for a Medicaid-covered patient encounter is often less than the amount the FQHC is entitled to receive under the PPS. In this situation, the Medicaid statute requires the state to make a supplemental payment—the wraparound payment—at least once every four months, to make up the difference between the PPS rate and the MCO payment. § 1396a(bb)(5)(B). This payment must be "equal to the amount (if any) by which the [per-visit rate] exceeds the amount of the payments provided under the [managed care] contract." 42 U.S.C. §1396a(bb)(5)(A). In essence, then: FQHCs are entitled to two discrete payments for Medicaid-covered encounters, the direct payment from the

beneficiaries. The Benefits Improvement and Protection Act of 2000 ("BIPA"), Pub. L. No. 106-554, 114 Stat. 2763, repealed cost-based reimbursement and adopted the PPS, which created these cost-controlling incentives. BIPA also alleviated the providers' burden of providing individual cost data. After the enactment of BIPA, providers need report only the number of Medicaid-eligible visits and MCO receipts.

5

MCO, and the wraparound payment from the state to supplement the former. The MCO payment plus the wraparound payment equals the PPS reimbursement. Critically here, the Medicaid statute does not mandate any particular methodology for calculating the wraparound payment, and different states have implemented different procedures. *Compare Three Lower Cntys. Cmty. Health Servs., Inc. v. Maryland*, 498 F.3d 294, 299 (4th Cir. 2007) (describing Maryland's practice whereby the FQHCs file claims to MCOs, and MCOs validate and process the claims and report them to the state), *with* Ohio Admin. Code § 5101:3-28-07 (wraparound payments are calculated based on claim data submitted to states directly by FQHCs).

The Medicaid statute also requires that states "provide for procedures of prepayment and postpayment claims review, including review of appropriate data with respect to the recipient and provider of a service and the nature of the service for which payment is claimed, to ensure the proper and efficient payment of claims and management of the program." 42 U.S.C. § 1396a(a)(37)(B). The Centers for Medicare and Medicaid Services ("CMS"), the federal agency responsible for overseeing the Medicare and Medicaid programs, issues the State Medicaid Manual, which interprets federal law and regulations to require "supporting documentation [that] includes as a minimum the following: date of service, name of recipient, Medicaid identification number, name of provider agency and person providing the service, nature, extent, or units of service, and the place of service." State Medicaid Manual § 2500.2, at 2-112, *available at* [www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Paper-Based-Manuals-Items/CMS021927.html](www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Paper-Based-Manuals-Items/CMS021927.html).

## B. New Jersey Medicaid and Calculation of Wraparound Payments

Following implementation of the PPS in 2000, New Jersey amended its state plan to read as follows:

After the final PPS encounter rates effective

6

> January 1, 2001 and July 1, 2001 are calculated, a financial transaction will be processed for the difference between the interim and final PPS encounter rate for encounters provided to Medicaid managed care beneficiaries. Once the PPS rates effective January 1, 2001 and July 1, 2001 have been finalized, all subsequent quarterly wraparound payments will be reconciled at 100% of the PPS encounter rate.

N.J. State Plan, attach. 4.19-B, at 9(c)(10-11). Though the plan amendment was approved by CMS, it does not specify how the State is to verify eligible claims or calculate wraparound payments, leaving this instead to the New Jersey Medicaid statute, N.J. Stat. Ann. § 30:4D-1, *et seq.*, and subsequent regulations.

The New Jersey Medicaid statute requires providers to "maintain such individual records as are necessary to fully disclose the name of the recipient to whom the service was rendered, the date of the service rendered, the nature and extent of each such service rendered, and any additional information, as the department may require by regulation." N.J. Stat. Ann § 30:4D-12(d). State regulations specify that health care providers agree to "furnish information for . . . services as the program may request." N.J. Admin. Code § 10:49-9.8(b)(2). The regulations also require FQHCs to "maintain an accounting system, which identifies costs in a manner that conforms to generally accepted accounting principles and maintain documentation to support all data." *Id.* § 10:66-1.5(d)(1)(x). The State is authorized to "conduct either on-site or desk audits of cost reports, including financial, statistical, and medical records," *id.* § 10:66-1.5(d)(1)(x)(4), and in connection with such, FQHCs are required to "submit other information (statistics, cost and financial data) when deemed necessary by the Department." *Id.* § 10:66-1.5(d)(1)(x)(5).

The New Jersey regulations implementing the quarterly wraparound payment system provide more specific details regarding Medicaid reimbursement and FQHC reporting

requirements:

> [A]ll quarterly wrap-around reports shall be reconciled at 100 percent of the difference between the final rate and the managed care receipts received for services provided to Medicaid . . . managed care beneficiaries. In the event of an underpayment, the Division shall reimburse the provider 100 percent of the amount due. In the event of an overpayment, the provider shall reimburse the Division 100 percent of the overpayment within 30 days of the due date of the Managed Care Wrap-around Report.

*Id.* § 10:66-1.5(d)(1)(viii)(4). FQHCs are required to submit two quarterly reports to the New Jersey Department of Human Services—one indicating the number of Medicaid-eligible encounters, *id.* at § 10:66-1.5(d)(1)(viii)(6), and another indicating "[a]ll Medicaid . . . managed care payments received by the FQHC for the quarter, including capitation, fee-for-service, supplemental or administration fund, and any other managed care payments," *id.* at § 10:66-1.5(d)(1)(viii)(7). FQHCs report these Medicaid encounters and the MCO receipts on reports called the "Medicaid Managed Care Encounter Detail Report" and the "Medicaid Managed Care Receipts Report." *Id.* at § 10:66-4, App'x. E. These reports do not require a claim-by-claim breakdown of the data; rather, they require FQHCs only to report the aggregate quarterly encounters and aggregate MCO receipts.

Up until the third quarter of 2011, to calculate the quarterly wraparound payment, the State relied solely on the self-reported Medicaid Managed Care Encounter Detail and the Medicaid Managed Care Receipts reports. Using the FQHCs' reports, the State would multiply the number of Medicaid encounters by the PPS rate, and then subtract from this figure aggregate MCO receipts. In practice, this meant that each FQHC would report all Medicaid-covered encounters on the worksheet, regardless of whether an MCO actually paid its contracted portion of the particular encounter.

8

Therefore, for reported encounters left unpaid by an MCO, the wraparound payment for that encounter would constitute the full PPS rate (i.e., full PPS rate minus the zero payment by MCO is equal to the wraparound payment).

**C. New Jersey's New Wraparound Payment System**

In a letter dated April 6, 2004, the State invited FQHCs to participate in a dialogue in an effort to remedy its concern that wraparound calculations were resulting in overpayments to the FQHCs. Over the next few years, the State conducted site visits and held quarterly meetings to discuss possible remedies. At a meeting on February 9, 2005, the State indicated for the first time that it would prefer to use data submitted to it by MCOs to calculate wraparound payments. It was not disputed that there were important discrepancies between the MCO and FQHC data systems. The State believed that the self-reported data resulted in substantial overpayment by the State for invalid Medicaid claims that had been correctly rejected by the MCOs. The NJPCA maintained that using MCO data would result in substantial underpayment because claims are rejected by MCOs for reasons unrelated to their Medicaid eligibility, and insisted that FQHCs continue to play a role in the verification process. In 2008, the State proposed that FQHCs include in their quarterly wraparound reports claim-level data fields (such as the name of the patient, the provider, Medicaid ID number, the encounter date, etc.) to verify each claim. NJPCA resisted this proposal and the State held off implementation.

In 2011, however, the State informed FQHCs that it had performed a review of the MCO Medicaid data and discovered that approximately 10% of claims submitted by FQHCs to MCOs had been denied but were never corrected and resubmitted for MCO reimbursement. Because these claims were nevertheless submitted as Medicaid-covered encounters in the FQHCs' quarterly wraparound reports, the State's wraparound payment for these claims amounted to the full PPS rate. According to the State, this indicated one of two problems: either (1) the rejected claims, if valid, should have been, but never were, paid by the MCOs at the

contracted rate (indicating that the State overpaid by the amount of the contracted rate), or (2) the claims were invalid, for a variety of reasons—such as lack of Medicaid eligibility, accidental duplicate claims, or fraud—and were not eligible for any State reimbursement (indicating that the State overpaid by the entire PPS rate).

In a May 5, 2011 letter addressed to each FQHC, the State informed the clinics that it had developed, through a third party, a detailed reporting system that captured FQHC claim data from MCOs called the "Molina Medicaid Encounter System." The State provided a disk to each FQHC with the Molina data and invited the FQHCs to point out and reconcile valid Medicaid encounters they believe were not reported by the Molina system.

In a letter dated June 9, 2011, the State ordered new data to be included in the FQHCs' quarterly reports beginning with the third quarter of 2011. The letter required the following detailed data fields to support reimbursement claims for each Medicaid encounter: (1) recipient full name; (2) recipient Medicaid ID number; (3) name of the MCO; (4) MCO assigned ID number; (5) FQHC billing number; (6) date of service rendered; and (7) procedure code and modifiers. The State indicated that it would not process the wraparound payments until it received this claim-level verification data. Despite raising concerns about the feasibility of providing this data on such short notice and requesting at least a one-quarter delay before implementation, the FQHCs expressed their intent to comply. The NJPCA, however, reiterated its position that the State was nevertheless responsible for making full and timely wraparound payments for all valid Medicaid encounters.

The State sent a letter to the FQHCs on September 12, 2011 that launched the parties into the instant dispute. The letter requested that FQHCs provide two additional data fields for each claimed Medicaid encounter: (1) the MCO payment amount, and (2) the MCO payment date (together, the "MCO payment data"). The letter also stated that if the FQHCs were unable to produce this information by the close of the third

10

quarter, the State would calculate the quarterly wraparound payment using the MCO data generated by the Molina system. To the NJPCA, this request evinced an unprecedented change to the New Jersey State Medicaid reimbursement system. Rather than ensuring reimbursement for all Medicaid-covered encounters, regardless of whether the FQHC obtained MCO payment, the State would reimburse FQHCs only for encounters for which the MCO had paid its contracted portion. The State has not retreated from this position, maintaining that an MCO's determination that a claim is valid and Medicaid-eligible is an essential prerequisite to the State's reimbursement.

The NJPCA objected to the change, principally on the ground that MCOs deny claims for myriad reasons unrelated to whether the encounter was covered under Medicaid. For example, MCOs might reject valid Medicaid services when a patient sees a covering physician rather than the patient's primary care physician when the primary care physician is on vacation or ill, when a single physician provides services in two different locations on the same day, or when an MCO's own processing delays wrongfully result in a claim's "late submission." When an MCO denies a valid Medicaid-eligible claim for one of these reasons *and* the State refuses to pay any wraparound payment, the FQHC is denied the entire PPS rate reimbursement for a Medicaid-eligible encounter, which, NJPCA argues, constitutes a violation of the federal Medicaid statute's mandate that FQHCs receive full and timely compensation.

While objecting to the change in policy, the FQHCs nevertheless attempted to comply with the State's additional documentation demands by the end of the third quarter of 2011. After reviewing the claims data submitted, however, the State determined that each of the FQHCs had failed to submit sufficiently complete or accurate data. According to the State, in some instances, FQHCs failed to provide the amount or date of the MCO payment; in others, FQHCs provided duplicate Medicaid numbers for multiple encounters. Therefore, the State based its third-quarter wraparound payments on the Molina system. The State made

11

these payments in late November 2011, which FQHCs claim resulted in severe budget shortfalls, including as much as $400,000 for one FQHC. [3]

The NJPCA brought the instant action on behalf of the New Jersey FQHCs, claiming that the State's new wraparound payment policy violated the federal Medicaid statute and the New Jersey's own Medicaid regulations. The NJPCA also alleged that the State's implementation of the new policy without changing existing regulations through notice and comment rulemaking procedure violated its right to due process. The parties cross-moved for summary judgment, and the NJPCA moved for a preliminary injunction requiring the emergency payment of wraparound funds based on the predecessor payment system.

## D. The District Court's Decision

The District Court found, first, that the State's unilateral change in its wraparound payment policy constituted an amendment of the State plan without obtaining federal approval in violation of the federal Medicaid statute. The Court also found that the State's departure from its own regulations without notice-and-comment rulemaking was arbitrary and capricious. The Court further found that the policy of requiring prior MCO payment for eligibility itself was arbitrary and capricious because prior MCO payment is not equivalent to eligibility for Medicaid, as MCOs deny claims for reasons unrelated to whether they are covered by Medicaid. In other words, because some Medicaid-covered encounters would remain unpaid, the new policy would guarantee that the State would violate the Medicaid statute's mandate to reimburse FQHCs at the PPS rate. Moreover, the Court found that the new policy constituted a denial of the FQHCs' right to procedural due process, because it deprived

---

[3] According to the State, several FQHCs submitted additional data validating Medicaid-covered encounters that had not been accounted for in the Molina data. The State, after reviewing the new data, made additional supplemental payments to these FQHCs.

them of their property interest in full and complete wraparound payments without adequate notice-and-comment rulemaking. Finally, the Court found that the FQHCs would be denied due process under the new policy, because they would be unable to meaningfully challenge wraparound payment denials other than through the private—and inadequate—MCO appeals process.

Accordingly, the District Court entered an order granting NJPCA's motion for summary judgment and denying the State's motion, and issued a preliminary injunction, enjoining the State from calculating wraparound payments in the manner proposed and ordering immediate emergency payment in the amount the FQHCs would have received under the preceding wraparound payment system. While the Court acknowledged that NJPCA had established its entitlement to summary judgment on the issue of whether the State's *past* actions violated the law, it noted "complex issues of fact relevant to the establishment of a *new* system, which are unsuited to resolution by the Court." A22 (emphasis added). Accordingly, the Court exercised its equitable powers to grant "limited injunctive relief" relating to remediating the State's past illegal actions, and retained jurisdiction over the case while the parties "engaged in a good-faith effort to resolve their differences and create a new system that complies with federal and state law." *Id.* The Court required that the State submit an implementation plan within 180 days of the order and that the parties submit regular written status reports. The State now appeals.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 28 U.S.C. § 1331 and we have jurisdiction under 28 U.S.C. § 1291. Our review of a district court's grant of summary judgment is plenary, and we view the facts in the light most favorable to the non-moving party. *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 794 (3d Cir. 2007). We review a district court's decision to grant a preliminary injunction under a three-part standard: findings of fact are reviewed for clear error, conclusions of law are evaluated under a plenary standard,

13

and the ultimate decision to grant the preliminary injunction is reviewed for abuse of discretion. *Rogers v. Corbett*, 468 F.3d 188, 192 (3d Cir. 2006).

## III. ANALYSIS

As an initial matter, the parties agree on appeal, notwithstanding the order of the District Court to the contrary, that the State may require that FQHCs provide claim-level data of the seven categories initially requested in the June 9, 2011 letter: (1) recipient full name; (2) recipient Medicaid ID number; (3) name of the MCO; (4) MCO assigned ID number; (5) FQHC billing number; (6) date of service rendered; and (7) the procedure code and modifiers. Appellee's Br. at 24. Indeed, the State was well within its statutory and regulatory authority to require this information, s*ee* 42 U.S.C. § 1396a(a)(37)(B) (requiring that states collect such information); N.J. Stat. Ann §§ 30:4D-12(d), (f) (authorizing agency to collect this data), and we will reverse the order of the District Court to the extent it enjoined the State from taking such action.

NJPCA does take aim, however, at the State's requirement that FQHCs submit the two MCO payment data fields—the MCO Payment Amount and the MCO Payment Date—before receiving quarterly wraparounds payments. On appeal—and conceded during oral argument—the NJPCA objects not to the collection of the MCO payment data, as such, but only insofar as the collection of that data is "really just indicia of a new policy limiting supplemental payment to only those encounters that received prior MCO payment." Appellee's Br. at 24; *see also id.* at 43 n. 12 ("The primary issue of contention in this case is the State unlawfully requiring prior MCO payment for an FQHC to obtain a corresponding supplemental payment."). Therefore, because the NJPCA appears to have waived its objection to the data collection requirements, and for the additional reasons we discuss below, we will also reverse the order of the District Court to the extent it enjoined the State from requiring FQHCs to report the two MCO payment data fields.

14

At the heart of the instant dispute is the NJPCA's attempt to invalidate the State's policy shift requiring prior MCO payment before processing wraparound reimbursements. The NJPCA contends that the State's action: (1) violated the federal Medicaid statute by (a) effectuating a *de facto* amendment to its State Medicaid Plan without obtaining prior federal agency approval in violation of 42 U.S.C. § 1396a and 42 C.F.R. § 430.12(c), and (b) failing to provide FQHCs with full and timely wraparound payments; (2) violated New Jersey regulations implementing Medicaid; and (3) violated the FQHCs' right to procedural due process by depriving them of wraparound payments without sufficient notice and opportunity to be heard.

The State, of course, has taken issue with each of these contentions. We depart from the District Court on several of its grounds for invalidating the State's action, and will address these first. At the end of the day, however, we conclude that the State's requirement of prior MCO payment before processing a wraparound reimbursement, absent an effective process by which FQHCs may challenge improperly denied claims within the statutorily mandated time period, violates the federal Medicaid statute's requirement that FQHCs receive full and timely wraparound payments.

### A. New Jersey Regulations

The District Court found that the MCO payment documentation requirement and the prior payment requirement violated New Jersey's regulations implementing Medicaid, and ordered compliance with those regulations. We conclude that the Eleventh Amendment barred the Court from taking any such action.

The NJPCA characterizes its claim that the State violated its own implementing regulations as a violation of federal law. A federal court, however, is "barred by the Eleventh Amendment from ordering . . . state officials to conform their conduct to state law." *Jones v. Connell*, 833 F.2d 503, 505 (3d Cir. 1987); *see also Concourse Rehabilitation & Nursing Ctr., Inc. v. DeBuono*, 179 F.3d 38,

15

43 (2d Cir. 1999) ("As we repeatedly have explained, the failure of a State authority to comply with State regulations cannot alone give rise to a [42 U.S.C.] § 1983 cause of action."). In *Pennhurst State School & Hospital v. Halderman*, the Supreme Court explained:

> A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.

465 U.S. 89, 106 (1984).

The Second Circuit applied this doctrine in the Medicaid context, when a health care provider claimed that New York's manner of conducting audits violated the New York plan and regulations, and, as such, violated the federal Medicaid statute. *Concourse Rehabilitation*, 179 F.3d at 43-44. The Court concluded that "absent the assertion of a specific conflict between the State plan or practices and federal law, such allegations fail to give rise to a federal cause of action. Because Concourse's allegations fail to assert such a specific conflict, and because the Eleventh Amendment bars our consideration of purely State law claims, we lack jurisdiction to decide appellant's claim." *Id.* at 44 (internal citation omitted). Similarly here, the District Court lacked jurisdiction to invalidate the State's action on the basis of the State's purported failure to abide by its implementing regulations.

## B. Due Process

We also disagree with the District Court that the State's change of policy violated the FQHCs' right to

procedural due process. The NJPCA makes two distinct due process claims: (1) that the State's action itself deprived the FQHCs of due process because it denied them the full wraparound payments to which they were entitled without affording sufficient notice and opportunity to be heard; and (2) that the MCO appeals process is inadequate to protect against the deprivation of their entitlement to full supplemental payments. The Court found that the FQHCs had succeeded on both of these claims, because (1) the policy change was not accompanied by a notice-and-comment rule-making procedure and (2) the FQHCs' "only recourse is the MCO appeals process—a private contractual remedy which may bear little relation to whether a disputed claim is eligible for Medicaid coverage." A. 16.

### 1. Notice and Opportunity to Heard

The State's failure to engage in notice-and-comment rulemaking does not constitute a procedural due process violation. The Due Process Clause does not require a state agency to engage in notice-and-comment rulemaking. *See Tenny v. Blagojevich*, 659 F.3d 578, 582 (7th Cir. 2011) ("The plaintiffs suggest that some sort of notice-and-comment rulemaking might satisfy constitutional due process. The prospect of a federal court ordering a state to create such a procedure risks turning procedural due process into a constitutionally mandated state administrative procedure act."). Indeed, the NJPCA does not try to defend this position before us. Rather, it essentially argues that FQHCs were not given enough notice to comb through and reconcile the data demanded by the State in time for the end of the third quarter of 2011. While sympathetic, we cannot see how this amounts to a deprivation of constitutional proportions. The NJPCA also argues that the State failed to give notice "justifying" the denial of full wraparound payments. However, the State had given the FQHCs notice of its intent to seek and base its wraparound reimbursement on MCO payment data as early as 2004 and solicited FQHCs' opinions on the issue on multiple occasions. The State's action did not amount to a due process violation.

## 2. MCO Appeals Process

The second due process claim is more perplexing as it seems to involve the adequacy of the process provided by non-state actors, the MCOs. This cannot rise to a constitutional violation. *See Gonzalez-Maldonado v. MMM Healthcare, Inc.*, 693 F.3d 244, 248 (1st Cir. 2012) ("Because we hold that [MCOs] are not governmental actors, the appellants' constitutional claims necessarily fail . . . ."). The NJPCA attempts to shoehorn the State into this claim by arguing that the new State policy leaves the FQHCs with no choice when confronted with a wrongful denial of a Medicaid-eligible claim but to go through the internal MCO appeals process, which the NJPCA contends is time-consuming and biased. But this simply restates the NJPCA's substantive Medicaid claim. If an FQHC is entitled to a wraparound payment for a Medicaid-eligible claim notwithstanding the lack of the prior MCO payment, the State's refusal to provide the payment is unlawful—no matter what subsequent process is offered. In any event, the adequacy or inadequacy of the internal MCO appellate process cannot be the basis for a procedural due process claim.

## C. Federal Medicaid Statute

The District Court found that the State's shift in policy violates the Medicaid statute in two ways: (1) it constitutes an amendment to the State Medicaid plan which requires federal approval, not the informal procedure used here; and (2) it deprives FQHCs of the full and timely wraparound payments to which they are entitled. We find that FQHCs do not have a private right of action to enforce the federal Medicaid statute's state plan approval requirement, but agree that the State's action violates the statute's requirement that a state timely make fully compensatory wraparound payments.

## 1. Federal Approval Requirement

As noted, the State must amend its plan and submit it for federal approval by the CMS to reflect "[m]aterial changes

in State law, organization, or policy, or in the State's operation of the Medicaid program." 42 C.F.R. § 430.12(c)(ii). If the CMS determines that a state plan or plan amendment does not comply with statutory requirements, it may deny the state federal funds. *Id.* §§ 430.15(c), 430.18. The District Court concluded that New Jersey's change in requiring the MCO data and prior MCO payment before processing wraparound payments constituted a *de facto* amendment to the plan without first securing federal approval in violation of the Medicaid statute. 42 U.S.C. § 1396a; 42 C.F.R. § 430.12(c). Because the FQHCs lack a private right of action to enforce the federal approval requirement—and NJPCA is comprised of New Jersey FQHCs—however, we do not address whether federal approval was required.

"In order to seek redress through § 1983, . . . a plaintiff must assert the violation of a federal *right* not merely a violation of federal *law*." *Blessing v. Freestone*, 520 U.S. 329, 340 (1997). To determine whether a particular statutory provision gives rise to federal right, we look to whether "Congress [1] must have intended that the provision in question benefit the plaintiff . . . [,] [2] the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence . . . [,] [and] [3] the statute must unambiguously impose a binding obligation on the States." *Id.* at 340-41. The Court, in *Gonzaga University v. Doe*, 536 U.S. 273 (2002), emphasized that Congressional authorization of a private right of action must be clear: "We now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983." *Id.* at 283.

Even though the FQHCs would benefit from enforcement of the federal approval provision *in this case*, there is no indication that Congress intended the approval provision to confer a private right of action to health care providers. *Pa. Pharmacists Assoc. v. Houstoun*, 283 F.3d 531, 536 (3d Cir. 2002) (en banc) ("It is important to keep in mind that the question whether a statute is *intended* to *benefit* particular plaintiffs is quite different from the question whether the statute *in fact benefits* those plaintiffs.").

19

Importantly, the provision contains no "rights-creating language," does not identify any discrete class of beneficiaries, and focuses primarily on the state as a regulated entity rather than any individuals. *See Gonzaga*, 536 U.S. at 287-90; *Long Term Care Pharmacy Alliance v. Ferguson*, 362 F.3d 50, 56-57 (1st Cir. 2004).

We join several courts in reaching this conclusion. *See, e.g.*, *Developmental Servs. Network v. Douglas*, 666 F.3d 540, 546-48 (9th Cir. 2011) (holding that even though state plan amendment was required under the Medicaid statute, this provision did not create a private right of action to health care providers because it was not intended to benefit them); *Clifton v. Schafer*, 969 F.2d 278, 284-85 (7th Cir. 1992) (holding that Medicaid recipients could not challenge a state's deviation from a plan which comports with federal law—the only enforceable right is a state plan that comports with federal requirements). *Cmty. Health Care Assocs. of New York v. New York State Dep't of Health*, __ F. Supp. 2d __, No. 10–cv–08258 (ALC), 2013 WL 395449, at *10 (S.D.N.Y. Feb 1, 2013) (finding that "statutes and regulations requiring prior approval . . . do not indicate Congress's unambiguous intention to benefit FQHCs specifically. Thus, there is no basis for relief in a private suit. . . ."); *cf. Pa. Pharmacists Assoc.*, 283 F.3d at 541-42 (holding that health care providers suing for higher reimbursement rates lacked private right of action to enforce separate Medicaid provision requiring state plans to provide methods and procedures guaranteeing quality of care and adequate access). Because FQHCs lack a private right of action to enforce the requirement of federal approval of state plan amendments, we lack jurisdiction to consider this claim.[4]

---

[4] In any event, we seriously doubt that the changes implemented by the State materially altered the terms of the federally-approved State plan. New Jersey's plan is silent on the methodology for calculating wraparound payments or quarterly reporting requirements, leaving specific implementation to subsequent State regulation and interpretation. *See Tinoco v. Belshe*, 916 F. Supp. 974, 982 (N.D. Cal. 1995) ("In such a complex area of the law, the

**2. Full and Timely Wraparound Payment under 42 U.S.C. § 1396a(bb)(5)**

While the NJPCA's claim under § 1983 cannot be based on the State's failure to procure prior federal approval to a state plan amendment, it can be based on the fact that the State infringed the providers' right to full payment under the federal Medicaid statute. *See, e.g.*, *Concilio de Salud Integral de Loiza, Inc. v. Perez-Perdomo*, 551 F.3d 10, 18 (1st Cir. 2008) (finding that whether the supplemental payment methodology is unlawful as applied is enforceable under § 1983); *Pee Dee Health Care, P.A. v. Sanford*, 509 F.3d 204, 209–12 (4th Cir. 2007) (same); *Cmty. Health Ctr. v. Wilson–Coker*, 311 F.3d 132, 136, 140 (2d Cir. 2002) (same); *see also West Va. Univ. Hosps. v. Casey*, 885 F.2d 11, 21 (3d Cir. 1989) (finding that rights-creating language of § 1396a(a)(13)(A) creates private right of action for providers).

The NJPCA challenges the State's refusal to make wraparound payments on claims for which the MCO has not paid a FQHC, contending that the Medicaid statute requires the full wraparound payment for any Medicaid-eligible claim

federal government expected states to formulate implementing regulations not described in the state plan."). In *Concourse Rehabilitation & Nursing Center, Inc. v. DeBuono*, the Second Circuit faced the issue of whether the New York State Department of Health's interpretation of its state plan departed so far from the terms of the plan that it "constitute[d] a *de facto* amendment to the plan, requiring federal approval prior to implementation." 179 F.3d at 44. Reasoning that the federal approval requirements could be triggered "not simply by a change in the State's administration of the plan, but only by an alteration of the plan itself," the Court held that a "State's interpretation of its own Medicaid plan cannot constitute a 'change' as that term is used in [§] 430.12(c) . . . unless, at a minimum, the clear and unequivocal effect of the interpretation is actually to alter the *written terms* of the plan." *Id.* at 46 (emphasis added). Here, as in *Concourse Rehabilitation*, there has been no change to the New Jersey plan as written, only to its administration.

it submits to the State regardless of whether it has first received MCO payment. The State, however, contends that it is not responsible for reimbursement at the PPS rate if the MCO has failed to make prior payment. For the reasons that follow, we believe the answer is somewhere in between: Under the Medicaid statute, the State is, indeed, responsible for reimbursement of the entire PPS rate for *all* Medicaid-eligible encounters. The State may, of course, in determining whether a claim is Medicaid-eligible (i.e., whether it counts as an encounter), rely in its discretion on many sources, including data supplied by FQHCs, MCOs, or its own administrative process, and may refuse to pay non-Medicaid eligible claims. Here, however, because the State concedes that the methodology it has chosen to verify claim validity—the fact of prior MCO payment—will result in failures to fully reimburse FQHCs at the PPS rate for valid Medicaid claims, we conclude that the State's insistence on making wraparound payments contingent on prior MCO payment violates the federal Medicaid statute.

Starting with the text, the federal Medicaid statute requires "payment to the [FQHC] by the State of a supplemental payment equal to the amount (if any) by which the amount determined [by multiplying the number of Medicaid encounters by the PPS rate] exceeds the amount of payments provided under the [MCO] contract." 42 U.S.C. § 1396a(bb)(5)(A). The State focuses on the word "supplemental," which, it maintains, requires that the FQHCs receive payment from the MCOs *first*, and the State then *supplement* that payment in its periodic wraparound payments. This places more weight on the word "supplemental" than it can possibly bear. Nothing in the provision requires the sequence suggested by the State, but only that the payment be "in addition to" the MCO contractual payment. The provision sets forth a relatively simple equation: a state should make up the difference between the amount owed under the PPS rate for all eligible Medicaid encounters and the amount *actually paid* to the FQHCs by MCOs at least every four months. *See Cmty. Health Care Assocs.*, 2013 WL 395449, at *13 (holding that "the phrase 'payments provided under the contract' permits deduction

only of amounts *actually* paid by the MCO to the FQHC"). Where there is a *valid* Medicaid encounter for which an MCO has failed to make a payment, the supplemental payment equals the entire PPS rate. *See id.* ("Whether or not the MCO makes a payment, the State is responsible for the supplemental payment (which may in fact be the entire PPS rate, if the MCO fails to make a payment)."). As the Fourth Circuit explained,

> the operative language of the statute for this case are the words "equal to." The supplemental payment must be "equal to" the difference between the payment made by the managed care organization and the per-visit rate fixed by the Medicaid Act. Thus the statute plainly provides that a State must make *fully compensatory* supplemental payments no less frequently than every four months.

*Three Lower Cntys.*, 498 F.3d at 301 (4th Cir. 2007).

The conclusion we reach is bolstered by the history of the wraparound payment, which originally arose in the context of the Balanced Budget Act of 1997 ("BBA"), Pub. L. No. 105-33, 111 Stat. 251. Section 4712 of the BBA removed the responsibility of MCOs to reimburse FQHC's at their cost-based rates as required under the predecessor statute. Rather, MCOs could agree on a contractual reimbursement rate as long as that rate was no less than the amount offered to a non-FQHC. *See id.* § 4712 (then codified as amended as 42 U.S.C. § 1396a(a)(13)(C) (1999)). The wraparound payment scheme was implemented to ensure, then, that even in managed-care states, FQHCs still received the full reimbursement amount to which they were entitled. *See Three Lower Cntys.*, 498 F.3d at 299 ("[E]ven when a State relies upon a managed care system to administer its Medicaid program, FQHCs are protected and must receive the full per-visit rate calculated pursuant to the methodology outlined in the Medicaid Act.").

The primacy of making FQHCs whole every four

months resonates in the CMS's subsequent interpretation of the supplemental payment system. In an interpretative letter to State Medicaid Directors,[5] the CMS explained that the wraparound provision "specifically requires States to make these supplemental payments. It is our conclusion that this requirement cannot and should not be delegated to an MCO, and that each State must determine any differences in payment and make up these amounts." April 20, 1998, Health Care Financing Administration State Medicaid Director Letter, *available at* http://www.medicaid.gov/Federal-Policy-guidance/federal-policy-guidance.html. The state, therefore, cannot simply shift its reimbursement obligations to MCOs. In another letter dated September 27, 2000 (as cost-based reimbursement was winding down), the CMS further clarified that full FQHC reimbursement for Medicaid-eligible encounters was paramount notwithstanding the risk of loss to the state. In addressing what would occur in the event an MCO became insolvent, the letter concluded:

> In order to ensure that [FQHCs] are paid reasonable costs under the Act, the State is required to include, as part of supplemental payments, monies that [FQHCs] subcontracted to receive but did not receive from an insolvent MCO. . . . Ultimately, the State, on behalf of the [FQHC], is eligible to receive any settlement funds that the [FQHC] recovers through bankruptcy proceedings.

---

[5] Though the letter was issued when Medicaid still operated on a cost-reimbursement basis, not under the PPS, the analysis is the same. The CMS's interpretative letters, "like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference." *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000). However, such interpretations are "entitled to respect" under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), "to the extent that those interpretations have the power to persuade." *Christensen*, 429 U.S. at 587 (internal quotation marks and citation omitted).

September 27, 2000, Health Care Financing Administration State Medicaid Director Letter, *available at* http://www.medicaid.gov/Federal-Policy-guidance/federal-policy-guidance.html. In other words, when an MCO is unable to make its contracted-for payment due to insolvency, the state is required to pay FQHCs the full reimbursable amount (at the time, the FQHC's reasonable costs), and seek restitution itself. Thus, while the statutory language is perhaps not as clear as one would wish, the tenor of the subsequent interpretations and the limited case law *is* clear: where MCOs do not pay out valid Medicaid claims, the FQHC should not be left holding the bag. *See Cmty. Health Care Assocs.*, 2013 WL 395449, at *13 ("There is no basis for the State's conclusion that the FQHC must accept the loss because the MCO denied payment for an otherwise legitimate visit."). And, of course, the Medicaid statute does not support the State's contention that a wraparound payment *must* follow a prior MCO payment. By opting into a managed care system, the State cannot avoid its responsibility to reimburse FQHCs at the full PPS amount. Rather, Section 1396a(bb)(5)(B) requires the State to "pay FQHCs *fully compensatory* supplemental payments not less frequently than four months after [the State] has received the claim for supplemental payment." *Three Lower Cntys.*, 498 F.3d at 303.

The State, however, makes a separate, and more compelling, argument justifying its reliance on requiring MCO payment prior to processing wraparound payments: the MCOs "play an essential role in determining when a claim is for a 'valid' and 'Medicaid-eligible' encounter." Reply Br. at 11. While the State must pay for all Medicaid-eligible claims, it must also determine which claims *are* Medicaid-eligible. Though the State has, since 2001, relied on the FQHCs self-reported data to validate eligibility, nothing in the Medicaid statute requires the State to rely upon this data, or proscribes the State from turning elsewhere.[6] As a district court recently

---

[6] We express no opinion as to whether New Jersey's own regulations require that the State rely solely on the quarterly

25

noted:

> [§ 1396a(bb)(5)] only require[s] that *payment* of the balance be paid by the State. It does not require the [S]tate to determine if the payment is necessary in the first place. That is, if payment is necessary, the [S]tate is responsible for it, but the statute is silent on the entity (be it the State or the MCO or the FQHC) which makes the threshold determination that payment is necessary.

*Cmty. Health Care Assocs.*, 2013 WL 395449, at *13.

Indeed, in *Three Lower Counties*, 498 F.3d at 305, the Fourth Circuit approved a system which relies on MCO processing to determine claim eligibility. The Court described the Maryland wraparound system as follows:

> Once the [MCO] ensures that (1) a covered service (2) has been furnished (3) to an enrollee (4) by an approved provider, it processes the claim and pays the market rate for the patient visit. It then passes the claim information on to the Department of Health. The Department of Health itself then makes the determination whether a supplemental payment under § 1396a(bb)(5) is necessary. . . . [E]ven if the Department of Health did delegate to managed care organizations the responsibility of determining whether a supplemental payment is necessary, § 1396a(bb)(5) only requires that the state plan provide for the payment of a supplemental payment. It does not require that

---

reports generated by the FQHCs to calculate wraparound payments, and as to whether the State must pass new regulations to effectuate a change in the calculation methodology. As we have discussed earlier, the District Court lacked jurisdiction to conclude that State law imposed such requirements.

26

> the state Medicaid agency itself make the determination whether a supplemental payment is necessary.

Nothing prevents the State from shifting claim verification from the FQHCs to the MCOs, and, consistent with the federal Medicaid statute, states may rely on MCOs to determine whether a claim is Medicaid eligible.

This is not, however, what happened here. Rather than leaving it to MCOs to determine whether or not a claim is Medicaid eligible, the State essentially adopted the fact of prior MCO payment as the proxy for Medicaid eligibility. If MCOs denied claims from FQHCs only because they were not eligible for reimbursement under Medicaid or because they were otherwise invalid, this would satisfy the State's obligation. The State concedes, however, that MCOs often deny payments for reasons unrelated to Medicaid, and we have already suggested some of these reasons—e.g., MCO delays, multiple visits in different locations in the same day, and visits with non-primary care physicians. The new policy would, therefore, inevitably exclude valid, Medicaid-eligible encounters and result in underpayment. Such a result would not comport with the Medicaid statute's requirement that FQHCs receive full and timely reimbursement under the PPS. *See Three Lower Cntys.*, 498 F.3d at 303 ("In enacting § 1396a(bb)(5), Congress addressed its concern that FQHCs be *fully and promptly* compensated for the services they render to Medicaid enrollees so that the FQHCs could perform their vital function in delivering healthcare to underserved populations. . . ."). On the record before us, we must conclude that requiring prior MCO payment before processing wraparound payments will result in the State's failure to meet this requirement. In the absence of any process by which an FQHC may promptly and effectively challenge an adverse MCO determination within the statutorily mandated time period, the District Court did not abuse its discretion in enjoining the State from refusing to process wraparound payments for all claims lacking prior MCO payment.

27

The State offers as an avenue of recourse to aggrieved FQHCs the administrative review process of N.J. Admin. Code § 10:49-10.3(a)(1), which permits a provider to request a hearing on any complaint arising out of the Medicaid claims process. Of course, if the State's policy is to deny wraparound payment for any claim lacking prior MCO payment *regardless* of Medicaid eligibility, the administrative review process is of no value. FQHCs must be able to meaningfully challenge adverse payment determinations and receive reimbursement from the State for valid, Medicaid-eligible claims that have been denied reimbursement by MCOs. *See Cmty. Health Care Assoc.*, 2013 WL 395449, at *13 ("To the extent that there may be other reasons a valid claim would be denied by the MCO, [FQHCs] must be able to challenge these adverse payment determinations . . . ."). Absent any such process,[7] the requirement of MCO payment prior to processing wraparound payments violates the Medicaid statute.[8]

---

[7] The MCO appeals mechanism does not appear to protect the interest of those FQHCs that received incorrect MCO determinations. Not only does this process take considerable time to reach an ultimate determination, but it fails to address more basic concerns: What if the MCO continues to wrongfully reject a Medicaid-eligible claim? Can an MCO's determination of claim validity end the inquiry?

[8] Contrary to the State's claim, our conclusion does not create a substantial risk of double payment. FQHCs remain under an obligation to seek MCO reimbursement for wrongfully denied claims, and the State is required to assist in this process. If an FQHC later receives MCO reimbursement for a claim for which it has already received the full PPS wraparound amount, the State will be credited with this amount in a later reconciliation process. *See* N.J. Admin. Code § 10:66-1.5(d)(1)(viii)(4).

Ultimately, if the system is functioning correctly (i.e., in the absence of bad faith or fraud), the conclusion we reach should not shift resources one way or the other, only the timing. Had we found, for example, that the State need not process a wraparound payment until a claim had been accepted and paid by an MCO, an FQHC, through the MCO

We emphasize that we are affirming the order of the District Court granting summary judgment and a preliminary injunction in favor of the NJPCA *only* on the ground that the State's new policy of requiring prior MCO payment before processing its quarterly wraparound payments, absent a meaningful process to challenge adverse payment determinations, violates the federal Medicaid statute. In so doing, we do not mean to suggest that prior MCO payment is wholly unrelated to Medicaid eligibility. Indeed, even if a state may not require an FQHC to bear the entire loss solely because of the MCO's lack of payment, it is far from irrational for the State to require MCO data on a quarterly basis as part of FQHC reporting, and to use such data when evaluating whether or not a claim is reimbursable under Medicaid. In any event, as we have noted earlier in this Opinion, the NJPCA has not pressed before us its initial challenge to the collection of the two MCO payment data fields.[9]

## IV. CONCLUSION

We will affirm the order of the District Court granting summary judgment in favor of the NJPCA on the ground that the State's requirement that wraparound payments be contingent on prior MCO payment violated the federal

---

appeals process (or with intervention by the State), would be able to eventually receive reimbursement for wrongfully denied claims. Fundamentally at issue is which party must bear the cost of MCO errors or delays in reimbursement until these disputed claims can be reconciled. The text of the statute and its legislative purpose, subsequent administrative interpretations, and the limited case law, all place a thumb on the scale in favor of prompt and complete State reimbursement.

[9] Even if it had, however, we would have no difficulty concluding that the District Court erred when it found that requiring such data was "arbitrary and capricious . . . because the new system itself fails to show a rational connection between the facts found and the choice made." A. 15 (internal quotation marks omitted).

Medicaid statute's requirement that FQHCs timely receive full wraparound payment for all Medicaid-eligible claims (and, concomitantly, requiring the emergency payment of wraparound funds based on the State's predecessor methodology) and enjoining the State from implementing a policy requiring prior MCO payment absent an adequate process for claim-eligibility verification. In all other respects, we will reverse the order of the District Court granting summary judgment and a preliminary injunction in favor of the NJPCA and denying the State's motion for summary judgment.